DAWN SESTITO*
dsestito@omm.com
CATALINA VERGARA*
cvergara@omm.com
DIMITRI PORTNOI*
dportnoi@omm.com
BRITTANY ROGERS*
brogers@omm.com
HEATHER WELLES*
hwelles@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407
Attorneys for Plaintiffs

*Application for admission *pro hac vice* pending

Additional counsel listed below

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Planned Parenthood Arizona, Inc., an Arizona non-profit corporation, on behalf of itself, its employees, and its patients; William Richardson, M.D., on behalf of himself and his patients; Deanna Wright, N.P., on behalf of herself and her patients; and Paul A. Isaacson, M.D., on behalf of himself and his patients, | Case No. |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| Mark Brnovich, Attorney General of Arizona, in his official capacity; Patricia McSorley, in her official capacity as Executive Director of the Arizona Medical Board; R. Screven Farmer; James M. Gillard; Edward G. Paul; Jodi A. Bain; Bruce Bethancourt; David Beyer; Teresa L. Connolly; Laura Dorrell; Gary R. Figge; Pamela E. Jones; and Lois Krahn, in their official capacities as members of the Arizona Medical Board; Cara M. | |

1   Christ, in her official capacity as the
    Director of the Arizona Department of
2   Health Services; Randy C. Quinn;
    Carmen Hill-Mekoba; Cecelia
3   Andersen; Theresa Berrigan; Jana
    Machesky; Lori A. Gutierrez; Melinda
4   Pheanis Preston; Elizabeth Boyer;
    Lajuana Gillette; and Lisa Smith, in
5   their official capacities as members of
    the Arizona State Board of Nursing; and
6   Joey Ridenour, in her official capacity
    as the Executive Director of the Arizona
7   State Board of Nursing,

8                      Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND
                                            INJUNCTIVE RELIEF

1  ALICE CLAPMAN*
   PLANNED PARENTHOOD FEDERATION OF
2  AMERICA
   123 William St., 9th Floor
3  New York, NY 10038
   Telephone: (212) 541-7800
4  aclapman@ppfa.org

5  Attorneys for Plaintiffs
   Planned Parenthood Arizona, Inc.; William
6  Richardson, M.D.; and Deanna Wright, N.P.

7  MARC A. HEARRON*
   CENTER FOR REPRODUCTIVE RIGHTS
8  1634 Eye St., NW, Suite 600
   Washington, DC  20006
9  Telephone: (202) 524-5539
   mhearron@reprorights.org
10
   JESSICA SKLARSKY*
11 CENTER FOR REPRODUCTIVE RIGHTS
   199 Water Street
12 New York, NY 10038
   Telephone: (917) 637-3600
13 jsklarsky@reprorights.org

14 Attorneys for Plaintiff
   Paul A. Isaacson, M.D.
15
   DANIEL B. PASTERNAK (Bar No. 023751)
16 SQUIRE PATTON BOGGS (US) LLP
   1 E. Washington St., Suite 2700
17 Phoenix, AZ 85004
   Telephone: (602) 528-4187
18 daniel.pasternak@squirepb.com

19 Attorneys for Plaintiffs

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1        Plaintiffs Planned Parenthood Arizona, Inc. ("Planned Parenthood" or "PPAZ");

2  William Richardson, M.D., PPAZ's Medical Director; Deanna Wright, N.P., a registered

3  nurse practitioner at PPAZ and PPAZ's Lead Clinician and Director of Family Planning

4  and Primary Care; and Paul A. Isaacson, M.D., a physician providing abortions and other

5  related health care services in Arizona (collectively, "Plaintiffs"), by and through their

6  attorneys, bring this Complaint against the above-named Defendants, their employees,

7  agents, and successors in office ("Defendants") and in support thereof state the following:

8                        **PRELIMINARY STATEMENT**

9        1.      Plaintiffs are Arizona health care providers who bring this civil rights

10  action, seeking declaratory and injunctive relief, on behalf of themselves, their employees,

11  and their patients, under the U.S. Constitution and 42 U.S.C. § 1983, to challenge and

12  obtain relief from several Arizona statutes that impose medically unjustified and unduly

13  burdensome restrictions on Arizona women seeking legal abortions.

14        2.      The U.S. Supreme Court has consistently recognized that access to abortion-

15  related health care is a fundamental constitutional right held by all women in the United

16  States.  A woman's right to determine when, how, and whether to have children is

17  essential to her "ability . . . to participate equally in the economic and social life of the

18  Nation." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992).  This right

19  entitles women to decide, for themselves in consultation with their medical care providers,

20  whether to shoulder medical, economic, and emotional risks associated with unplanned

21  pregnancies, how to respond to unanticipated changes in health or life circumstances, and

22  how much information to disclose to others about those decisions.

23        3.      For more than a decade, Arizona women have suffered a sustained, multi-

24  front attack on their constitutional right to reproductive health care, led by anti-choice

25  activist groups and their allies in Arizona state government.  These groups have worked in

26  concert to develop and impose legal barriers designed to reduce the number of available

27  abortion providers, erect obstacles to women's ability to access remaining providers, and

28  significantly delay or entirely foreclose women's ability to obtain safe abortion services.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

These deliberate barriers operate, individually and together, to deny Arizona women their constitutional rights.

4. In this lawsuit, Plaintiffs challenge three specific sets of abortion restrictions: (1) a collection of statutes and administrative rules that effectively prohibit anyone other than a licensed physician from providing abortions and related services (the "Physician-Only Rules")[1]; (2) statutes requiring Plaintiffs' patients to visit clinics in person, twice, at least 24 hours apart, to receive certain State-mandated counseling before receiving an abortion (the "Mandatory Delay and Two-Trip Requirement")[2]; and (3) a ban on the use of telemedicine (i.e., technology making remote medical care possible through the use of techniques such as video conferencing) to provide abortion services (the "Telemedicine Ban").[3]  Individually and collectively, these provisions (the "Challenged

---

[1] The following statutory provisions constitute the Physician-Only Rules: A.R.S. §§ 32-1606(B)(12) (prohibiting the Arizona State Nursing Board from "decid[ing] scope of practice relating to abortion"); 32-2501(11) (prohibiting physician assistants from performing abortions, alone and in conjunction with A.R.S. § 32-2531(G)(12)); 32-2531(B) (prohibiting physician assistants from performing surgical abortions); 32-2532(A)(4) (prohibiting physician assistants from performing medication abortions); 36-449.03(C)(3) (requiring a physician to be "available" at a clinic at which medication or aspiration abortions are performed); 36-449.03(D)(5) (requiring a physician to estimate the gestational age of the fetus), (F)(4) (requiring a physician to be physically present at, or in the vicinity of, a clinic where medication or aspiration abortions are performed), (F)(5) (requiring a physician to provide counseling), (F)(8) (requiring "[t]he physician" performing the abortion to provide specific follow-up); 36-2152(A), (B), (H)(1), (M) (permitting only physicians to provide minors with abortion services); 36-2153(A) (requiring physicians to provide counseling), (E) (prohibiting non-physicians from performing surgical abortions); 36-2155 (prohibiting non-physicians from performing surgical abortions); 36-2156(A) (requires "the physician who is to perform the abortion" or "the referring physician" to facilitate provision of an ultrasound); 36-2158(A) (requiring physicians, rather than another qualified clinician, to provide information "orally and in person"); 36-2161(A)(16), (20)-(21), (D) (requiring "the physician performing the abortion" to create certain records); and 36-2162.01(A), (C) (requiring physicians to complete certain records as either the "referring physician" or the "physician who is to perform the abortion").  The Physician-Only Rules also include the following regulations: A.A.C. R9-10-1507(B)(2), (3); A.A.C. R9-10-1509(A)(2), (B)(1), (5), (C), (D)(3)(a); A.A.C. R9-10-1510(B)(1); and A.A.C. R9-10-1512(A)(6) and (D)(3)(d).

[2] The following provisions constitute the Mandatory Delay and Two-Trip Requirement: A.R.S. §§ 36-2153(A), (F); 36-2156(A); 36-2158(A).

[3] A.R.S. § 36-3604 ("A health provider shall not use telemedicine to provide an abortion.").

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Laws") impair the health, safety, and well-being of women seeking abortions in Arizona and violate their constitutional rights.

5.      The Challenged Laws, both individually and collectively, currently impede women's access to safe and effective abortion-related health care in a multitude of ways. For instance, these restrictions severely limit the number of medical professionals who can provide an array of abortion-related services including pregnancy screening, counseling, ultrasound interpretation, and medication distribution, with no demonstrated health-related benefit resulting from this limitation.  As a result, the Challenged Laws have eliminated abortion providers, forced clinics to close, and diminished remaining providers' capacity to meet the need for critical health-care services.  In 2011, for example, the Arizona Legislature passed a bill (H.B. 2416) applying medically unnecessary, onerous regulations to medication abortion providers, eliminating a significant portion of the individual providers in the state.  *See infra* ¶ 40.

6.      The cumulative effect of the Challenged Laws, which have increasingly limited the number of medical providers allowed to provide abortion services and delay women's ability to access safe health care, has also led to the closure of four PPAZ health centers previously located in Yuma, Goodyear, Prescott Valley, and Chandler.  The Challenged Laws have forced PPAZ to reduce or eliminate abortion services at other clinics as well.  Three of the four remaining PPAZ clinics providing any abortion services are in the Phoenix and Tucson metropolitan areas, leaving only one clinic—the Flagstaff clinic—to serve the entire northern part of the state.  For three years, that clinic, which serves largely rural and Native American populations, did not provide any abortion services at all because PPAZ was unable to identify and recruit a single clinician who satisfied the unnecessary, abortion-specific requirements imposed by Arizona.  Now, that clinic is operational again, but has had to reduce sharply the services it offers, providing medication (not aspiration) abortion, including the State-mandated separate counseling and procedure appointments, only one day per week.  As a result, many women are denied access to *any* care outside the Phoenix and Tucson areas.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    7.    As a direct result of the Challenged Laws, PPAZ provides approximately

2    40% fewer abortions than it provided in 2011, and can provide abortion care in fewer

3    locations, leaving significant parts of Arizona without any provider at all.

4    8.    The substantial reduction in abortion providers throughout Arizona caused

5    by the Challenged Laws has imposed numerous burdens on the few remaining physician

6    providers in Arizona, including PPAZ's physicians and Dr. Isaacson, and their patients.

7    Following the passage of the Challenged Laws, Dr. Isaacson began providing only

8    abortion services at his clinic in Arizona to avoid turning away women in need, taking

9    him away from other parts of his general gynecological practice.  Even so, patients must

10   travel long distances at significant expense, and experience considerable delays due to

11   clinic congestion.  These obstacles, among others, further reduce access to care even in

12   locations where physicians are available.  Dr. Isaacson is also one of only three providers

13   in the state who provides abortions past 16 weeks gestation, and so he has seen first-hand

14   the effects that medically unnecessary delays have had on his patients.

15   9.    The elimination of qualified providers has led to extreme hardships for

16   Arizona women.  Women who live near an abortion provider suffer significant delays

17   because there are too few providers to satisfy demand.  Women who do not live close to a

18   provider not only face the same delays, they also must travel significant distances, at times

19   up to 700 miles round trip, to access constitutionally protected health care services.

20   10.    Under Arizona law, women also must visit the clinic at least twice to satisfy

21   the State's mandatory, medically unnecessary requirement that women make two in-

22   person visits to a health care clinic and wait at least 24 hours between the initial visit and

23   the second visit prior to receiving abortion services.  This forces women to either make

24   two trips to the clinic or to incur the added expense and obligation of arranging for

25   overnight accommodations (if a next-day appointment is available).  In practice, the delay

26   is usually longer than 24 hours.

27   11.    Travel-related, financial, and logistical burdens mean that women are put in

28   compromising and potentially dangerous situations where they risk being forced to

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

disclose confidential medical information to their employers, partners, families, and childcare providers, just to make the required visits.  And for some women, particularly poor and low-income women, these burdens are simply too much to overcome.  Accordingly, the practical effect of these laws is to deny many Arizona women their constitutional right to abortion.

12.     The Challenged Laws have not produced health benefits for women or any other benefits, let alone benefits that outweigh these burdens.  Rather than improve health outcomes or increase patient safety, the Challenged Laws create hurdles and delays that force some women to seek abortions at later stages of pregnancy; significantly and unnecessarily increase the expense and travel required to access an abortion provider; deny some women their preferred and at times medically indicated method of abortion; expose low-income women, women living in rural communities, victims of intimate-partner violence, and otherwise-disadvantaged women to particularized risks; compromise women's ability to keep their health-care decisions confidential; impose gender-based stereotypes that women are not capable of making independent decisions regarding their reproductive choices and appropriate medical care; and deny abortions entirely to some women.  The Challenged Laws also undermine health-care providers' ability to exercise sound medical judgment and damage the provider-patient relationship.

13.     Behind the smokescreen of medical regulation, the Challenged Laws affirmatively *harm* women's health by drastically limiting access to qualified health-care providers and imposing medically unnecessary delays.  Far from protecting women's health, women are instead subject to unnecessary risks or denied care altogether when the numerous barriers are simply too extensive to surmount.

14.     The true intent of the Challenged Laws—to impede both women and medical providers so systematically that abortion becomes more onerous and even unavailable to many—is made clear by the stark contrast with the State's treatment of *all other medical procedures*.  In other contexts, the State permits non-physician advanced practice clinicians (APCs), including registered nurse practitioners (RNPs), certified nurse

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    midwives (CNMs) and physician assistants (PAs), to conduct a variety of medical

2    procedures based on their experience and training, regulated by expert State agencies.  In

3    fact, the State permits these clinicians to provide pregnancy- and miscarriage-related care

4    that is, at times, essentially medically identical to abortion procedures.  APCs are also

5    permitted to conduct independent patient counseling regarding medical procedures.  The

6    State imposes no mandatory waiting period on any other procedure.  And far from

7    opposing the use of telemedicine, the State has promoted and relied on it to fill gaps in

8    rural health care coverage.  In sum, in all other contexts, the State trusts doctors, APCs,

9    and other health-care providers—along with the expert boards that regulate them—to

10   safely provide Arizonans needed medical care.  Only with respect to abortion has the

11   Arizona Legislature stepped in to overrule those expert judgments and impose

12   burdensome and medically unnecessary regulations.

13        15.    As the Supreme Court recently affirmed in *Whole Woman's Health v.*

14   *Hellerstedt*, 136 S. Ct. 2292 (2016), a state may not use medically unsupported "health"

15   regulations to impose an undue burden on women's access to abortion.  Laws that "have

16   the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion

17   impose an undue burden on the right." *Id.* at 2309 (internal quotation marks omitted). A

18   burden on abortion access is undue when any benefits it confers are outweighed by the

19   burdens it places on abortion access.

20        16.    The Challenged Laws, together and individually, lack any legitimate benefit

21   and impose an undue burden on women seeking abortion care in Arizona, and therefore

22   violate the due process clause of the Fourteenth Amendment to the U.S. Constitution.  The

23   Challenged Laws should be permanently enjoined.

24                  **JURISDICTION AND VENUE**

25        17.    This Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §

26   1331 and 28 U.S.C. § 1343(a)(3).

27

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

18.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

19.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because all Defendants, who are sued in their official capacities, carry out their official duties at offices located in this District and the events giving rise to this action occurred in this District.

## PARTIES

### A. Plaintiffs

20.     Plaintiff **PPAZ** is a not-for-profit corporation organized under the laws of Arizona and is the largest provider of reproductive health services in Arizona, operating seven health centers throughout the state and providing a broad range of reproductive and sexual health services.  In the 2017-18 fiscal year, PPAZ served more than 33,000 patients.  PPAZ's services include cervical cancer screening; breast and annual gynecological exams; family planning counseling; pregnancy testing and counseling; reproductive health education; testing and treatment for sexually transmitted infections; contraception; surgical and medication abortion services and related care; prenatal consultation and care; and health care related to miscarriage.  Currently, only four of PPAZ's health centers are able to offer abortion services, and only on limited days per week when physicians are available.  PPAZ also employs RNPs who desire, and could be readily trained, to provide abortion services, and would employ other APCs if they could provide abortion services.  In addition to serving as one of only a handful of Arizona abortion providers, PPAZ is one of only two entities that provide training in abortion care to Arizona obstetrics and gynecology (OBGYN) medical residents; the other is the medical practice of Plaintiff Dr. Isaacson.

21.     Plaintiff **William Richardson, M.D.**, is a licensed, board-certified obstetrician-gynecologist and PPAZ's medical director.  Dr. Richardson received his medical training at the University of Michigan Medical School, and has been providing

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    abortion care for the past 19 years.  Before joining PPAZ in 2015, Dr. Richardson

2    operated a private practice in which he provided comprehensive family planning and

3    women's health services, including abortion, to more than a thousand patients each year.

4    In his role as medical director of PPAZ, Dr. Richardson oversees the medical staff at

5    PPAZ's seven clinics, performs all abortions at PPAZ's Southern Arizona Regional

6    Health Center in Tucson, and spends substantial time mentoring, training, and recruiting

7    physicians to work with PPAZ or incorporate abortion care into their practices.  In

8    addition, he leads one of only two abortion-training programs available to Arizona's

9    OBGYN medical residents.  Dr. Richardson previously worked for two years with Whole

10   Woman's Health to develop a program to provide medication abortion via telemedicine in

11   Las Cruces, New Mexico.  Given his substantial experience training OBGYN residents

12   and APCs, Dr. Richardson is also highly qualified to train APCs to perform medication

13   and aspiration abortions.

14        22.     Plaintiff **Deanna Wright, N.P.**, is a registered family nurse practitioner who

15   provides or has provided health care at all seven of PPAZ's health centers.  Ms. Wright

16   began working in patient care at PPAZ in 2013, and transitioned to her role as a full-time

17   nurse practitioner in 2015 after receiving her master's degree.  She is now PPAZ's

18   Director of Family Planning and Primary Care and Lead Clinician.  In her role at PPAZ,

19   Ms. Wright provides a wide range of health care services, including procedures that are

20   comparable to first-trimester abortion in risk and complexity, and would seek to provide

21   abortions if permitted.  For instance, Ms. Wright provides patient counseling, diagnoses

22   and treats sexually transmitted infections, inserts intrauterine devices, performs and

23   interprets ultrasounds, provides early pregnancy care, and provides follow-up care for

24   abortion patients.  Previously, in her role as a registered nurse, Ms. Wright administered

25   sedatives for surgical abortion patients, which involved exercising significant clinical

26   judgment over proper dosage and administration.  She is qualified to provide medication

27   abortion services, and would require minimal, readily available training to provide

28   aspiration abortions.  Ms. Wright would immediately begin providing medication

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    abortions and would immediately seek training to provide aspiration abortions if

2    Arizona's Physician-Only Rules did not prohibit her from providing those services.

3        23.    Plaintiff **Paul A. Isaacson, M.D.**, is a licensed, board-certified obstetrician-

4    gynecologist.  Dr. Isaacson received his medical training at Tufts University School of

5    Medicine and has been providing abortion care in Arizona for more than 20 years.  Dr.

6    Isaacson is the co-owner of and one of two physicians at Family Planning Associates

7    Medical Group (FPA), an independent abortion clinic located in Phoenix.  Dr. Isaacson's

8    clinic is one of only three medical practices in Arizona that regularly provides abortions

9    up to 24 weeks after the first day of a women's last menstrual period (LMP).  It is also the

10   foremost practice in Arizona providing care to patients referred by other physicians and

11   who are seeking abortions because of medical indications, including following a diagnosis

12   of a fetal anomaly.  As a co-owner and physician at his clinic in Phoenix, Dr. Isaacson

13   oversees the medical staff.  Dr. Isaacson also leads one of the only two abortion-training

14   programs available to Arizona's OBGYN medical residents.

15       **B. Defendants**

16       24.    Defendant **Mark Brnovich** is the Attorney General of Arizona.  As such, he

17   may, within his discretion, institute and conduct prosecutions for any crime occurring

18   within the State of Arizona.  He also provides the Arizona Medical Board with legal

19   counsel and defends its decisions to revoke or suspend physician's licenses in appeals

20   before the state courts.  *See* A.R.S. §§ 41-192, 41-193.  He is charged with enforcing the

21   licensing provisions for all health care institutions, including bringing actions to revoke a

22   license or enjoin the operation of a licensee, *id.* § 36-429(B), and actions to recover civil

23   penalties for violation of licensing obligations, *id.* § 36-431.01(E).  Further, he may

24   petition to enjoin a physician's practice.  *Id.* § 32-1857.  He is named as a defendant in his

25   official capacity, and is a proper defendant in a suit brought under 42 U.S.C. § 1983.

26       25.    Defendant **Patricia McSorley** is the Executive Director of the Arizona

27   Medical Board, which is responsible for enforcing disciplinary sanctions against

28   physicians who violate the Challenged Laws.  A.R.S. § 32-1451.  As Executive Director,

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1   Defendant McSorley is charged with "[i]nitat[ing] an investigation if evidence appears to

2   demonstrate that a physician may be engaged in unprofessional conduct," *id.* § 32-

3   1405(C)(12), which is defined to include violations of the Challenged Laws. *See id.* § 32-

4   1401(27) (A violation of state law or rule applicable to the practice of medicine

5   constitutes "unprofessional conduct."). In addition, Defendant McSorley must "sign and

6   execute disciplinary orders, rehabilitative orders and notices of hearings as directed by the

7   board[,]" and review any complaint alleging unprofessional conduct. *Id.* § 32-

8   1405(C)(14), (21). She is named as a defendant in her official capacity, and is a proper

9   defendant in a suit brought under 42 U.S.C. § 1983.

10       26.    Defendants **R. Screven Farmer**, **James M. Gillard**, **Edward G. Paul**, **Jodi**

11   **A. Bain**, **Bruce Bethancourt**, **David Beyer**, **Teresa L. Connolly**, **Laura Dorrell**, **Gary**

12   **R. Figge**, **Pamela E. Jones**, and **Lois Krahn** are members of the Arizona Medical Board.

13   The Arizona Medical Board is responsible for enforcing disciplinary sanctions against

14   physicians who violate the Challenged Laws. *See* A.R.S. § 32-1401(27) (A violation of

15   state law or rule applicable to the practice of medicine constitutes "unprofessional

16   conduct."); *id.* § 32-1451 (The board may subject the physician found to have committed

17   "unprofessional conduct" to "censure, probation . . . , suspension of license or revocation

18   of license or any combination of these."). The Arizona Medical Board has statutory

19   authority to initiate investigations of physician unprofessional conduct, including

20   violations of the challenged laws, and to discipline licensed physicians. *Id.* §§ 32-

21   1403(A)(2), (5); 32-1451(A), (J). They are named as defendants in their official

22   capacities, and are proper defendants in a suit brought under 42 U.S.C. § 1983.

23       27.    Defendant **Cara M. Christ** is the Director of the Arizona Department of

24   Health Services. The Arizona Department of Health Services is responsible for adopting

25   and enforcing rules relating to abortion clinics, such as rules for clinic administration,

26   personnel qualifications and records, staffing requirements, patient rights, and abortion

27   procedures. *See* A.R.S. §§ 36-406(1), 36-449.02. Dr. Christ is responsible for

28   enforcement of regulations relating to abortion clinics. *See, e.g.*, *id.* §§ 36-427(A)(1), 36-

1  431.01(A).  She is named as a defendant in her official capacity, and is a proper defendant

2  in a suit brought under 42 U.S.C. § 1983.

3         28.     Defendants **Randy C. Quinn**, **Carmen Hill-Mekoba**, **Cecelia Andersen**,

4  **Theresa Berrigan**, **Jana Machesky**, **Lori A. Gutierrez**, **Melinda Pheanis Preston**,

5  **Elizabeth Boyer**, **Lajuana Gillette**, and **Lisa Smith**, are members of the Arizona State

6  Board of Nursing.  The Arizona State Board of Nursing is responsible for disciplining

7  nurses, including RNPs and CNMs, who commit acts of unprofessional conduct, which

8  may include license suspension or revocation and civil penalties.  A.R.S. § 32-1663.

9  Unprofessional conduct includes "[a]iding or abetting in a criminal abortion or attempting,

10  agreeing or offering to procure or assist in a criminal abortion."  *Id.* § 32-1601(26)(c).

11  The Arizona State Board of Nursing may also, through the attorney general, seek an

12  injunction against a nurse who violates Arizona's nursing rules or the board's orders.  *Id.*

13  § 32-1666.01.  They are named as defendants in their official capacity, and are proper

14  defendants in a suit brought under 42 U.S.C. § 1983.

15                        **FACTUAL STATEMENT**

16  **I.     General Safety and Prevalence of Abortion**

17         29.     Legal abortion is one of the safest procedures available in modern health

18  care and is far safer than carrying a pregnancy to term.  Fewer than one-quarter of one

19  percent of all women receiving a legal abortion at a clinic or doctor's office or other

20  legally recognized facility experience a complication requiring hospitalization.  The rate

21  of hospitalization is far higher for women carrying a pregnancy to term and undergoing

22  childbirth.  Additionally, the risk of death associated with childbirth is significantly higher

23  than that associated with abortion.

24         30.     Approximately one in four American women will have an abortion in her

25  lifetime.  Roughly 75 percent of these women are poor or low-income, and 86 percent are

26  unmarried.  Approximately 60 percent already have at least one child.  Women who have

27  abortions are more likely to be women of color.

28

31.     In the first trimester of pregnancy, abortions are performed using medication or vacuum aspiration.  Both methods are extremely safe and effective.

32.     Medication abortion is generally available in the first 10 weeks after the first day of a women's last menstrual period (known as "LMP").  It is typically administered using two prescription drugs, mifepristone and misoprostol.  Mifepristone, also known as "RU-486" or by its commercial name Mifeprex, blocks the actions of progesterone, which is necessary to sustain a pregnancy, and increases the efficacy of the second medication in the regimen, misoprostol.  Misoprostol, which women generally take at home or another location of their choosing between 6 and 48 hours after the mifepristone, causes the uterus to contract and expel its contents.  Women typically pass their pregnancies at home, in a process similar to a miscarriage.

33.     There are multiple forms of "surgical" abortion, which are performed after medication abortion is no longer available or in lieu of medication abortion, based on a woman's preferences or medical circumstances.  The most common method is vacuum or suction aspiration, which is the primary form of surgical abortion used during the first trimester.  In an aspiration abortion, the clinician inserts a small sterile tube through the cervix into the uterus and uses gentle suction to evacuate the contents of the uterus.  The procedure typically takes five to ten minutes to complete, and involves no incision.

34.     Over recent decades, the general trend in the United States is toward earlier abortion.  Although abortion is an extremely safe procedure, the risk of complications, the invasiveness of the required procedure, the need for deeper levels of sedation, and expenses and time necessary to obtain an abortion increase with time.  Therefore, medically unnecessary delays harm women's health and impose financial and logistical burdens.  Studies of women who have received abortions have found that many women would have preferred to have had their abortion earlier than they did.

35.     In many states, both medication and first-trimester aspiration abortion are provided by non-physicians, including RNPs, CNMs, and PAs.  Medication abortion is also available in some states via telemedicine.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    **II.    History of Anti-Choice Legislation in Arizona**

2         36.    Like other states where politics and policies are dominated by anti-choice

3    activists, Arizona has singled out and regulated abortion far more heavily than other

4    medical procedures, including medical procedures that present significantly higher risks.

5    The purpose and effect of these restrictions is to limit women's access to abortion-related

6    health care.  Plaintiffs describe some of these restrictions below, including restrictions not

7    challenged here that form part of the context in which the Challenged Laws impede access

8    to abortion care.

9         37.    Abortion is the only medical procedure for which the Arizona Legislature

10   has banned telemedicine delivery.  Abortion is the only medical procedure the Arizona

11   Legislature has specifically excluded from both nurse practitioners' and physician

12   assistants' scopes of authorized practice.  It is the only procedure upon which the State

13   imposes a medically counterproductive mandatory waiting period.  And it is the only

14   procedure for which the State imposes a unique, medically unnecessary web of

15   regulations on medical facilities.  Such policies limit the number of available clinicians

16   and impose an array of medically unnecessary requirements that hurt women's health—all

17   to reduce the availability of abortion services.  This tactic has become so common that it

18   has earned an acronym, TRAP ("targeted regulation of abortion providers").

19        38.    Arizona had relatively few restrictions on abortion prior to 2002.  In 2002,

20   the State prohibited physician assistants from performing aspiration abortions.  H.B. 2542,

21   2002 Ariz. Sess. Laws, ch. 277 (codified at A.R.S. § 32-2501).  The State had also passed

22   H.B. 2706, a TRAP law requiring special licensing for facilities providing surgical

23   abortions that finally went into effect in modified form in 2010, after the federal courts

24   found that the original version violated women's constitutional rights.  *See Tucson*

25   *Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004).

26        39.    Undeterred by federal court rulings, the pace of anti-choice legislation

27   picked up dramatically in 2009.  That year, the Arizona Legislature passed H.B. 2564, a

28   sweeping anti-choice bill that imposed numerous restrictions on abortions and abortion

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    providers.  2009 Ariz. Sess. Laws, ch. 172.  Among other things, the legislation enacted

2    the first iteration of the Mandatory Delay and Two-Trip Requirement, forcing health-care

3    providers to provide patients with certain State-mandated information at least 24 hours

4    prior to any abortion (codified at A.R.S. § 36-2153(A)); put in place a physician-only

5    requirement for surgical abortions (codified at A.R.S. §§ 36-2153(E), 36-2155); and

6    imposed a notarized parental consent requirement for minors.[4]

7         40.    In 2011, the Arizona Legislature passed H.B. 2416, yet another bill

8    imposing further restrictions on abortion providers.  2011 Ariz. Sess. Laws, ch. 10.  This

9    law imposed additional physician-only restrictions, effectively prohibiting APCs from

10   providing any abortion-related health care.  Under H.B. 2416 and its implementing

11   regulations, as described further below, APCs cannot provide counseling, review

12   ultrasounds, or fill out certain paperwork at patients' first mandatory visit, during which

13   no medical procedure is performed and no medication is prescribed.  The bill also

14   required additional biased and unnecessary counseling, and imposed a ban on utilizing

15   telemedicine in abortion care (codified as A.R.S. § 36-3604).  Additional bills passed

16   during that legislative session specifically prohibited physician assistants from providing

17   medication abortion, S.B. 1030, 2011 Ariz. Sess. Laws, ch. 178 (codified at A.R.S. § 32-

18   2532(A)(4)), and prohibited the Arizona State Board of Nursing—which makes scope-of-

19   practice decisions for Arizona nurses in all other areas of medical care—from making

20   such determinations with regard to abortion, S.B. 1169, 2011 Ariz. Sess. Laws, ch. 145

21   (codified at A.R.S. § 32-1606(B)(12)).  The Arizona Legislature passed the latter bill to

22   overturn a ruling by the Arizona State Board of Nursing that RNPs could safely and

23   competently provide first-trimester aspiration abortion.

24        41.    The Arizona Legislature imposed additional anti-choice laws in 2012.  That

25   year, the Legislature required physicians with admitting privileges to be available during

26

27        [4] Plaintiffs in this case challenge application of the current iteration of the 24-hour
     waiting period and the physician-only requirement for surgical abortions, but not the
28   parental consent requirement.

COMPLAINT FOR DECLARATORY AND
                                                       INJUNCTIVE RELIEF

1    any abortion, which also unnecessarily restricts APCs from providing abortions at PPAZ

2    facilities or independent abortion providers.  H.B. 2036, 2012 Ariz. Sess. Laws, ch. 250

3    (codified as A.R.S. § 36-449.03).  The bill also required that an ultrasound be

4    administered 24 hours before an abortion procedure (codified at A.R.S. § 36-2156(A));

5    compelled an additional follow-up visit, bringing the total number of legislatively

6    mandated in-person visits to three; imposed additional restrictions on abortions for

7    minors; and imposed even more burdensome reporting requirements on abortion

8    providers.

9         42.    Also in H.B. 2036, the Arizona Legislature imposed additional requirements

10    that courts have since struck down as unconstitutional violations of women's rights.  One

11    required medication abortion to be administered in compliance with an outdated protocol

12    that appeared at the time on the federal Food and Drug Administration's (FDA) approved

13    label for a specific drug, a provision held unconstitutional by the U.S. Court of Appeals

14    for the Ninth Circuit in *Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905 (9th

15    Cir. 2014).  Another imposed a 20-week abortion ban that the Ninth Circuit struck down

16    in *Isaacson v. Horne*, 716 F.3d 1213 (9th Cir. 2013).

17        43.    Another bill passed in 2012, H.B. 2800, attempted to block abortion

18    providers from receiving any federal funds administered through the State's Medicaid

19    program.  The Ninth Circuit affirmed the district court's holding that the statute violated

20    federal law.  *Planned Parenthood Ariz., Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013).

21        44.    In 2015, the Arizona Legislature banned all health plans offered through the

22    State's health insurance exchange from covering abortions.  S.B. 1318, 2015 Ariz. Sess.

23    Laws, ch. 87.  Despite objections from physicians, the bill also required providers to

24    misinform women scheduled for a medication abortion that the abortion could be

25    "reversed" mid-process.  After providers challenged that provision in court, the State

26    repealed it.

27        45.    These and other similar laws passed by the Arizona Legislature represent a

28    sustained campaign to deny women their constitutional rights to abortion in the State of

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Arizona.  By one newspaper's account, the State has already spent "roughly $2.32 million . . . defending laws that legislators were warned may not pass muster in court."[5]  This effort continues today—in April 2018, Arizona passed a new law, designed to shame and intimidate women and interfere with abortion providers' medical judgment and the clinician-patient relationship by requiring providers to ask women why they are choosing to have an abortion and to provide even more burdensome and unnecessary reports on compliance with existing counseling requirements.  S.B. 1394, 53d Leg., 2d Reg. Sess. (Ariz. 2018) (codified at A.R.S. § 36-2161(A)(12)).  The State already collects voluminous information from abortion providers—far more than from other health-care providers—including whether a woman is seeking an abortion for medical reasons.

### III.   The Challenged Laws Have Unconstitutionally Burdened the Right of Arizona Women to Choose Abortion

46.     As Arizona restrictions on abortion-related care have increased, women's ability to obtain abortions has correspondingly decreased, particularly their ability to obtain abortions near where they live and on a timely basis.  This reduction in access has imposed numerous, severe burdens on Arizona women's exercise of their constitutional rights without any benefit.

#### A.   The Challenged Laws Have Resulted in Clinic Closures, Reduced Access to Providers, and Reduced Abortion Rates

47.     There are eight primary abortion clinics in Arizona, four operated by PPAZ and four others, all located in Phoenix, operated by independent providers, including Dr. Isaacson's clinic.  Although additional facilities, such as hospitals, provide a small number of abortions each year, these clinics provide the vast majority of abortions in Arizona.[6]  These numbers represent a *more than 40% decline* in abortion clinics since

---

[5] Ben Giles, *Court Losses Piling Up for Anti-Abortion Legislation, Cost State Millions*, Arizona Capitol Times (Sept. 22, 2017), https://azcapitoltimes.com/news/2017/09/22/arizona-cathy-herrod-anti-abortion-legislation-legal-fees/.

[6] A total of 22 facilities reported data to the State through its mandatory reporting requirements in 2017.  Marguerite L.S. Kemp, et al., Ariz. Dep't of Health Servs.,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   2011, when PPAZ was able to provide abortions at additional facilities utilizing APCs.

2   Currently, 80% of Arizona counties—12 out of 15—have no clinics that provide abortion,

3   including the poorest counties in the state.  Only PPAZ's Flagstaff clinic currently

4   operates outside the Phoenix and Tucson metro areas, and due to the effect of the

5   Challenged Laws, that clinic is only able to provide medication abortion care one day per

6   week.  In terms of individual clinicians, Arizona lost a significant proportion of its

7   abortion providers after the Physician-Only Rules went into effect in 2009 and 2011.

8       48.    Restricting access to abortion providers prevents women from obtaining

9   abortions that they would otherwise receive.  Texas laws that reduced access to abortion

10  facilities—laws struck down as unconstitutional in *Whole Woman's Health*—reduced

11  reported abortions significantly in counties that no longer had an abortion provider within

12  50 miles, dramatically reduced availability of second-trimester abortions, and forced

13  women to leave the state to receive abortion care.  Restrictions on abortion access have

14  had similar impacts in other states, including Arizona, where such laws have resulted

15  closed clinics, reduction in clinicians able to provide abortion services, delays, and

16  reduced abortion rates.

17      49.    Arizona is a largely rural state.  The state's largest city, Phoenix, is located

18  in Maricopa County.  The second-largest city, Tucson, is located in Pima County.  In

19  addition to clinics providing aspiration and medication abortion care in and near those

20  cities, prior to 2011, PPAZ had clinics providing medication abortion care in Flagstaff

21  (Coconino County), Prescott Valley (Yavapai County), Goodyear (Maricopa County),

22  Chandler (Maricopa County), and Yuma (Yuma County).

23      50.    Following the passage of the Physician-Only Rules in 2009 and 2011, PPAZ

24  was forced to stop providing abortion services at all clinics not staffed by physicians.

25  This included clinics in Yuma, Prescott Valley, Goodyear, and Chandler, all of which

26

27  Abortions in Arizona: 2017 Abortion Report 5 (2018), *available at*
    https://azdhs.gov/documents/preparedness/public-health-statistics/abortions/2017-arizona-
28  abortion-report.pdf.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1   were forced to close as a result.  Of PPAZ's seven remaining health centers, only three

2   were able to provide abortion care due to the shortage of available physicians.  All of

3   those clinics were in the Phoenix and Tucson metro areas, leaving nearly 90% of the

4   state's counties with no consistent abortion provider.  In 2014, PPAZ was able to recruit a

5   physician to provide medication abortion one day per week in Flagstaff.  Thus, in

6   Flagstaff specifically, a one-week delay in obtaining an abortion is effectively mandatory,

7   as women must visit the clinic twice in person due to the Mandatory Delay and Two-Trip

8   requirement.  Moreover, women must make themselves available on the single day of the

9   week when the Flagstaff clinic is staffed by a physician, which is not always possible.

10  Until 2011, a qualified, highly skilled RNP provided medication abortion services at the

11  Flagstaff clinic four days per week.

12      51.     Because PPAZ was forced to close clinics providing medication abortion

13  and cease providing that service at other clinics that remained open, women seeking

14  access to medication abortion have been particularly impacted by the Challenged Laws.

15      52.     PPAZ currently offers first-trimester abortion services at four of its seven

16  health centers: Flagstaff Health Center (medication only), Glendale Health Center

17  (medication and aspiration), Tempe Health Center (medication and aspiration), and

18  Southern Arizona Regional Health Center (medication and aspiration).  PPAZ's three

19  additional centers (Central Phoenix, Maryvale, and Mesa) do not provide any abortion

20  services because physicians are not available to staff those locations as required under the

21  Physician-Only Rules.

22      53.     The only other principal providers of abortion services other than PPAZ are

23  all located in the Phoenix metropolitan area, including Dr. Isaacson's clinic.

24      54.     The State began publishing data obtained through mandatory collection

25  from abortion providers in 2010.  The 2010 data show that for women living in Yuma and

26  Yavapai Counties, all or almost all women receiving medication abortions received those

27  abortions in their county of residence.  After PPAZ was prohibited from providing

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

abortions there, women living in those counties were required to travel significantly further to receive abortion care, in some cases nearly 400 miles round trip.

55.     Similarly, according to the State's data, all or almost all women living in Coconino County—where PPAZ's Flagstaff clinic is located—who received medication abortions in 2010 received those abortions in Coconino County.  Between 2011 and 2014, all women living in Coconino County were forced to travel to another county to receive abortion care because PPAZ's Flagstaff clinic did not have a physician on staff.  Although PPAZ was able to recruit a physician in 2014 to provide medication abortion one day per week at the Flagstaff clinic, the clinic can provide only about one-quarter of the level of care it previously provided.  As a result, some women living in Coconino County are still required to travel elsewhere to obtain abortion care, including all women seeking aspiration abortions.

56.     In addition to closing clinics, the Challenged Laws have eliminated a significant number of abortion providers in metropolitan areas and have imposed numerous ancillary but burdensome obligations on physician providers, further reducing access to care even in locations where physicians are available due to increased congestion.

**B.      The Challenged Laws Impose Numerous Individual and Cumulative Burdens on Arizona Women**

57.     The Challenged Laws create an undue burden on women seeking abortions. For instance, as described, the Physician-Only Rules have dramatically reduced the number of clinicians legally able to provide abortion services in Arizona, and have led to the cessation of abortion services and eventual closing of multiple PPAZ clinics that provided these services—as well as other critical health care—to rural populations.  *See infra* ¶¶ 71-90, 113-140.  By requiring an additional clinic trip 24 hours prior to receiving an abortion, the Mandatory Delay and Two-Trip Requirement forces women to assume the time and expense necessary to arrange transportation; take additional time off work or school (if they can get time off at all); arrange childcare; assume medically unnecessary

health risks; and assume risks to the confidentiality of highly personal decisions—and potentially safety in the case of intimate-partner-violence victims—all with no medical benefit whatsoever. *See infra ¶¶* 141-167. Some women are forced to travel hundreds of miles to obtain this constitutionally protected health care. The Telemedicine Ban works alone and in conjunction with both of these restrictions to require additional travel and deny women access to a health care delivery tool that is not only available to other Arizona citizens, but is affirmatively promoted by the State. *See infra ¶¶* 169-186.

58.     Because of Arizona's geography, many women have to travel significant distances to access the limited abortion services available in the Phoenix area, Tucson, and, one day per week, Flagstaff. For instance, Yuma—where PPAZ previously had a clinic providing medication abortion care—is approximately 186 miles, or at least a six-hour round trip, from the closest PPAZ clinic providing abortion services. For women who lack access to a vehicle, public transportation would take significantly longer and may often be impossible.

59.     In addition, the Hopi, Navajo, Apache, and Hualapai Indian Reservations make up approximately half of the northern part of Arizona, including the two lowest-income counties in the state, Apache and Navajo. Women traveling from Hopi or Navajo land could be required to travel more than 200 miles each way just to reach PPAZ's Flagstaff clinic. The Hualapai reservation is approximately 113 miles from Flagstaff. If those women need or prefer a surgical abortion—for instance, because mandatory delays and limited provider options have made them ineligible for medication abortion—they would need to travel to Phoenix, approximately 10 hours round trip. Unsurprisingly, the abortion rates in these rural counties are the lowest in Arizona.

60.     Travel in the northern part of Arizona is particularly difficult due to conditions including rural roads and poor weather. Therefore, while such travel is always a long, logistically difficult, and expensive proposition, at certain times of year and for women living in certain locations, these trips may be physically impossible.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

61.     Particularly when women are forced to travel long distances to reach an abortion provider, they often delay until they are able to secure enough money and time to pay for transportation, lodging, and the cost of missing work.  Those women unable to obtain the necessary resources are prevented entirely from seeking abortion-related care.  Moreover, not every woman is aware of the Mandatory Delay and Two-Trip Requirement when she first presents at a clinic.

62.     Many women facing these long travel distances and difficult conditions must also arrange and pay for childcare.  Like most abortion patients in the United States, nearly 60% of Arizona abortion patients in 2016 had at least one child, and nearly 35% had two or more children.  Childcare can be difficult to find and can be prohibitively expensive.  Even if a woman has family or friends upon whom she can rely for childcare, having to ask for this help may force her to disclose health information she wanted or needed to keep confidential.

63.     Travel and cost burdens are particularly significant for rural women, women of color, and poor and low-income women.  Most women seeking abortions are living at or near the federal poverty level (FPL).

64.     Reflecting these statistics, the majority of PPAZ's and Dr. Isaacson's patients are poor or low-income.  For these women, the costs of additional travel are significant, and they often cause delays in access to abortion.  These delays push women past the gestational point at which medication abortion is available, resulting in women being denied access to medication abortion.  These burdens at times even deny women access to abortion care completely.

65.     The combination of mandatory delays and de facto delays imposed by limits on access to care push women into abortions later in pregnancy.  Although abortion remains a very safe procedure, the risk of complications increases with gestational age.  Women may also be forced to carry unwanted pregnancies to term or resort to potentially unsafe self-help methods.

66.     Moreover, when a woman has made the decision to have an abortion, delaying her ability to do so can cause a substantial toll on her emotional and psychological health, as can limiting her health-care options.  For instance, a woman's decision between having a medication abortion and an aspiration abortion is often a very important and personal one.  There are many reasons a woman may strongly prefer to have a medication abortion over an aspiration abortion, and vice versa.  Some women strongly prefer medication abortion because it can offer privacy and control.  In particular, women who are victims of sexual abuse or other forms of intimate-partner violence are more likely to strongly prefer medication abortion.  In contrast, other women strongly prefer aspiration abortion, as it can be completed quickly and in a clinical setting.

67.     The most current information available shows that laws limiting women's access to care are *affirmatively harmful* to women's health.  In a recent consensus report reviewing numerous studies of abortion care in the United States, the National Academies of Science, Engineering, and Medicine concluded that "abortion-specific regulations on the site and nature of care, provider type, provider training, and public funding *diminish . . . quality care*" by "delay[ing] care unnecessarily from a clinical standpoint," "prohibit[ing] qualified clinicians . . . from performing abortion," and "mandat[ing] clinically unnecessary services" such as "preabortion ultrasound[s]" and "in-person counseling visit[s]."[7]

68.     Delays, additional travel distances, and additional trips also hinder a woman's ability to keep her abortion confidential, which is particularly important for victims of intimate-partner violence and women who have become pregnant as a result of rape or incest.  If a woman is a victim of reproductive coercion or another form of intimate-partner violence, confidential access to abortion care can be life-saving.

---

[7] Nat'l Acad. Sci., Eng'g, & Med., Consensus Study Report, The Safety and Quality of Abortion Care in the United States S-9 (2018), *available at* http://nap.edu/24950 [hereinafter National Academies Consensus Report].  All emphasis added unless otherwise noted.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

69.     Moreover, these laws harm the patient-provider relationship by second-guessing medical providers' judgment and by prohibiting APCs, who are often women's primary contact for non-abortion-related reproductive health care, from providing abortion-related health care services to their patients.

IV.     **Arizona's Physician-Only Rules**

70.     Arizona law contains multiple provisions that, separately and together, effectively prohibit APCs from providing abortion care in Arizona, a prohibition that is not medically justified and dramatically limits the number of abortion providers in Arizona, imposing significant burdens on women.

A.     **Arizona's Physician-Only Rules Prohibit Advanced Practice Clinicians from Providing Abortion Services**

71.     A.R.S. § 36-2155 establishes that only licensed physicians may perform surgical abortions.  *See also id.* § 36-2153(E) ("An individual who is not a physician shall not perform a surgical abortion.").  The Arizona Legislature's definition of "surgical abortion" does not include termination of an ectopic pregnancy, surgery "to remove a dead fetus," or "patient care incidental to the procedure."  *Id.* § 36-2155(B)(2); *see also id.* § 36-2151 (definitions).  In other words, non-physician clinicians are *not* prohibited from performing substantially identical procedures involving uterine aspiration of fetal tissue; they are only prohibited from doing so if the procedure is done to terminate a pregnancy. There is no medical- or health-related reason for this distinction.

72.     There are several other abortion-related statutes and administrative rules that necessitate the presence of a physician, rather than a qualified non-physician clinical practitioner.  These rules effectively require all clinics providing abortion services, including those providing exclusively medication abortion, to be staffed by a physician. Other provisions require physicians to spend time on tasks that could be appropriately delegated to other clinicians, thereby reducing the number of patients a particular physician is able to treat, causing delays for other patients, and decreasing overall access to abortion-related health care.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

73.     For example, "[a]t least twenty-four hours before the abortion, the physician who is to perform the abortion or the referring physician [must] inform[] the woman, orally and in person" of a list of State-mandated disclosures.  A.R.S. § 36-2153(A)(1).

74.     These mandatory consultations also consume significant amounts of physician time that could otherwise be used to provide abortion care, or other health-care services, to patients, and to provide that care more promptly.  This is particularly true when considered in combination with the Telemedicine Ban, as without the Telemedicine Ban and the "in person" counseling requirement, physicians could provide counseling at times other than their limited clinic hours.

75.     While PPAZ physicians and Dr. Isaacson strongly believe in options counseling, their practice is burdened when they must spend a significant percentage of time on counseling sessions and other State-mandated tasks that are not medically necessary or could be appropriately delegated to other qualified staff but for the Challenged Laws.

76.     By definition, the Physician-Only Rules require PPAZ's physicians, including Dr. Richardson, to spend, on average, at least half their patient time conducting the State-mandated counseling visits and other unnecessary tasks.  Similarly, Dr. Isaacson spends at least half his time conducting the State-mandated counseling visits and other tasks instead of providing medically needed counseling and actual abortion care.

77.     In any event, the State-mandated counseling could be performed—and prior to 2011, was regularly performed—by other qualified staff members.  Therefore, the counseling requirement exacerbates provider shortages.

78.     In addition to these mandatory physician counseling requirements, Arizona requires health clinics providing a threshold number of abortions per year to be licensed as "abortion clinics."  A.R.S. § 36-449.02.  Prior to 2011, clinics were required to follow these licensing rules only if they provided surgical abortion.  However, H.B. 2416 expanded these regulations to cover medication abortion.  *See* H.B. 2416, 50th Leg., 1st Reg. Sess. (Ariz. 2011).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

79.     The statutes and regulations governing clinic licensing (collectively, the "Licensing Rules") require a physician to perform additional ancillary services, including providing a physical examination prior to an abortion, estimating the gestational age of the fetus, interpreting the State-mandated ultrasound, providing special counseling, and discharging patients—all tasks that APCs are qualified to perform. *See* A.R.S. § 449.03(C)(3), (D)(3), (F)(4)-(5), (8); A.A.C. R9-10-1509(A)(2), (B)(1), (B)(5), (C), (D)(3)(a); A.A.C. R9-10-1510(B)(1).  These rules effectively require a physician to be physically present in all clinics providing abortion care and to conduct all State-mandated pre-abortion medical visits, as well as the abortion itself and other tasks.

80.     The Licensing Rules also require a physician to be available during all abortions and to remain on the premises of the clinic until all patients who receive a medication abortion are "stable and ready to leave" and until all patients who received a surgical abortion are "stable and ready to leave the recovery room."  A.R.S. § 449.03(C)(3), (F)(4); A.A.C. R9-10-1507(B)(2)-(3).  The physician must then sign the patient's discharge order.  A.R.S. § 449.03(F)(4); A.A.C. R9-10-1510(B)(1).  These rules prevent PPAZ from operating clinics staffed by APCs rather than physicians and prevent PPAZ and Dr. Isaacson from providing abortions at physician-staffed clinics outside physician clinic hours.

81.     In addition to the Licensing Rules, other statutes also impose unnecessary obligations on physicians, both effectively requiring physicians to perform abortions and requiring clinics providing abortions to be continuously staffed by physicians. *See supra* note 1.

82.     Upon signing H.B. 2416, then-Governor Jan Brewer issued a press release stating that the bill "add[ed] an important safeguard for the health of women by requiring that a physician be present for any abortion."[8]  Contemporaneous news accounts also described the Physician-Only Rules, and specifically the expansion of the Licensing Rules

---

[8] Press Release, Governor Jan Brewer Signs Pro-Life Legislation That Strengthens Informed Consent, Protects Women (Apr. 2, 2011).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   to incorporate medication abortion, as prohibiting APCs from providing medication

2   abortion.[9]

3       83.     Upon information and belief, the State of Arizona and the named

4   Defendants, as applicable, interpret the Physician-Only Rules to require a physician to be

5   physically present at all licensed abortion clinics to conduct pre-abortion mandatory

6   counseling and during all abortion procedures, and would enforce the Physician-Only

7   Rules to penalize PPAZ, other independent clinics, and/or their medical providers,

8   including the physician and nurse-practitioner Plaintiffs, as applicable, if APCs provided

9   abortion services without a physician present.  As noted, Arizona statutes also specifically

10  ban APCs from performing aspiration abortions.  Accordingly, Arizona law prevents

11  PPAZ from providing any abortion services at any facility not then staffed by a physician,

12  and prevents other physicians providing abortion care in Arizona, including Dr. Isaacson,

13  from utilizing APCs to provide abortions in their practices.  APCs are similarly denied the

14  ability to provide abortion services.

15      84.     The penalties for violating the Physician-Only Rules are severe.  PPAZ,

16  independent clinics, and their staff would be at risk of committing a misdemeanor for

17  operating a clinic in violation of the Licensing Rules, A.R.S. § 36-431, as well as being

18  vulnerable to civil penalties, *id.* §§ 36-449.03(I), 36-431.01, and license revocation, *id.* §§

19  36-427, 36-449.03(I).  Individual clinicians could also lose their professional licenses and

20  be subject to civil penalties.  *E.g.*, A.R.S. §§ 32-1451(M), 32-1401(27)(a), 32-2531, 32-

21  2551(J), (K).  Other Physician-Only Rules carry similar penalties.  *E.g.*, A.R.S. § 36-

22  2163(H)-(J) (as amended by S.B. 1394) (subjecting medical professionals and

23  organizations to criminal, civil, and licensure penalties for violation of the reporting

24  requirements).  The State of Arizona, by and through its administrative agencies, collects

25      [9] *E.g.*, Howard Fischer, *Abortions Discontinued at 7 Locations in Arizona*,
26  Tucson.com (Aug. 19, 2011), http://tucson.com/news/science/health-med-fit/abortions-
    discontinued-at-locations-in-arizona/article_86710884-2258-54bf-8bf7-
27  d51d6d5788e9.html; Caitlin Coakley, *Planned Parenthood of Arizona Reeling as Flood of
    New Abortion Restrictions Set to Become Law*, The Arizona Capitol Times (Aug. 29,
28  2011).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1   a significant amount of information from PPAZ and other independent clinics, including

2   Dr. Isaacson's clinic, regarding their operations on a regular basis and regularly reviews

3   their compliance with the Licensing Rules.

4        85.    There is no medical justification for requiring physicians, rather than other

5   qualified clinicians, to perform these identified tasks or for requiring a physician to

6   perform or be physically present prior to, during, or after medication and first-trimester

7   aspiration abortion procedures performed by qualified APCs.

8        86.    Requiring a physician with admitting privileges to be available for first-

9   trimester abortions that could otherwise be performed by APCs is medically unnecessary

10  and provides Arizona women with no demonstrable health benefit.

11       87.    But for the Physician-Only Rules, PPAZ would hire additional APCs to

12  provide abortion services.

13       88.    Although Dr. Isaacson's clinic does not currently employ any APCs, but for

14  the Physician-Only Rules, Dr. Isaacson would hire APCs to provide safe medication and

15  early abortion services and to assist in other aspect of abortion care.

16       89.    To the extent necessary, RNPs at PPAZ have the desire and ability to obtain

17  additional training to achieve competency in medication and aspiration abortion, and

18  would begin to do so immediately if not for the Physician-Only Rules.

19       90.    PPAZ and Dr. Isaacson's clinic regularly train Arizona medical residents in

20  abortion care.  Indeed, upon information and belief, they are the only providers of such

21  training in Arizona.  PPAZ also regularly trains RNPs in procedures that are comparable

22  in skill and complexity to both medication and aspiration abortion care.  Accordingly,

23  PPAZ and Dr. Isaacson's clinic would be able to train these clinicians to provide such

24  care.

25

26

27

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1

2

### B. There Is No Medical Benefit to the Physician-Only Rules Because Advanced Practice Clinicians Are Able to Safely Perform Aspiration and Medication Abortions and Provide Related Care

3

#### 1. Regulation of Advanced Practice Clinicians in Arizona

4

91.     Registered nurse practitioners are a subset of registered professional nurses

5

who have a broader scope of practice than other nurses by virtue of their advanced

6

education and training.  The Arizona State Board of Nursing is responsible for licensing

7

all registered nurses in the state.  Under Arizona law, all RNPs must complete an

8

approved nurse practitioner education program, hold a national certification as a nurse

9

practitioner, and have an expanded scope of practice in a specialty area, such as women's

10

health.  A.R.S. § 32-1601(22).  CNMs are a specialized type of RNP.  *See id.* § 32-

11

1601(5).  Arizona law generally permits RNPs to perform all acts that the RNP is

12

qualified to perform and that are generally recognized as being within the role and

13

population focus of the RNP's certification.  A.A.C. R4-19-508(B).  Generally, RNPs

14

have broad authority to dispense drugs, including controlled substances, provided they

15

obtain the required Drug Enforcement Administration registration.

16

92.     Physician assistants must graduate from an approved educational program

17

and pass a state-approved certifying examination.  A.R.S. § 32-2521(A).  As a general

18

matter, PAs are permitted to perform "*any medical service* that is delegated by the

19

supervising physician if the service is within the physician assistant's skills, is within the

20

physician's scope of practice and is supervised by the physician," including prescribing

21

drugs, diagnosis, development of treatment plans, "[o]ffering counseling and education,"

22

signing documents requiring a physician's signature, and "performing minor surgery."  *Id.*

23

§ 32-2531(C), (D), (E), (G).  Physician supervision "does not require the personal

24

presence of the physician at the place where health care tasks are performed if the

25

physician assistant is in contact with the supervising physician by telecommunication."

26

*Id.* § 32-2531(J).

27

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

93.     The Arizona Legislature has given the Arizona State Board of Nursing broad authority to "[a]dopt and revise rules necessary to carry into effect" Arizona's nursing statutes and to "[p]ublish advisory opinions regarding registered and practical nursing practice and nursing education."  A.R.S. § 32-1606(A)(1), (2).  The Board also has the responsibility to "[a]dopt rules establishing those acts that may be performed by a registered nurse practitioner or certified nurse midwife."  *Id.* § 32-1606(B)(12).  Thus, the Legislature has made the judgment that as a general matter, the Board is capable of assessing appropriate licensing requirements and regulating the medical services provided by Arizona's RNPs (and sub-groups of RNPs, including CNMs).

94.     Under this authority, the Arizona State Board of Nursing has identified numerous complex procedures as being specifically within RNPs' scope of practice given appropriate training and education, including procedures as complex or more complex than providing medication and aspiration abortion.

95.     The *only exception* to these rules is abortion.  In 2008, prior to the passage of many of the Physician-Only Rules, the Arizona State Board of Nursing exercised its statutory authority to determine that RNPs' scope of practice could include first-trimester abortion.  In reaching that decision, the Board considered testimony from numerous experts, peer-reviewed research, and other evidence.  Following that decision, in a notable and distinct statutory carve-out that rejected the judgment of the State's expert licensing board, the Arizona Legislature explicitly prohibited the Board from recognizing that abortion care—and only abortion care—is within RNPs' and CNMs' scope of practice.  A.R.S. § 32-1606(B)(12).  The Arizona Nurses Association opposed the bill because the legislation "[w]as adopted without the usual evidence-based process utilized by the Legislature to establish scope of practice."[10]

---

[10] Arizona Nurses Association, *Public Policy SB 1169*, http://www.aznurse.org/page/LB04/Public-Policy-SB-1169.htm (last visited Mar. 25, 2019).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

96.    Similarly, the Legislature has specifically carved out abortion from PAs' scope of practice.  *See* A.R.S. §§ 32-2531(B), 32-2532(A)(4).

### 2.    APCs Can Provide Safe and Effective Abortion Care in Arizona

97.    APCs are restricted from providing abortions, yet regularly perform procedures that are just as, if not more, complicated.  Under Arizona law, with certain restrictions, APCs can prescribe and dispense various types of medications, including potentially addictive and dangerous medications.  And advanced practice nurses, including RNPs and CNMs, as well as registered nurses, can perform a wide variety of procedures that are just as or even more complex than surgical abortions, including childbirth.  PAs can perform "*any medical service*" within their competence delegated by a supervising physician.  A.R.S. § 32-2531(D).  Moreover, licensed midwives can deliver babies without any physician supervision, yet the law prohibits all non-physicians from performing abortions.

98.    Furthermore, RNPs in Arizona can care for women experiencing miscarriages using a procedure known as dilation and curettage, which is *medically identical* to an aspiration abortion.  The only meaningful difference between assisting in the completion of a miscarriage and an aspiration abortion is that a woman experiencing bleeding from a miscarriage faces *greater risk* of complications than a woman receiving a planned abortion.  Although these procedures are identical, they are treated differently under Arizona law, with no medical basis.  *See* A.R.S. § 36-2155(B)(2) (excluding surgery "to remove a dead fetus" from the definition of "surgical abortion").  Instead, the purpose of this rule can only be to limit women's access to qualified abortion providers.

99.    Anti-choice activists in Arizona who promoted the Physician-Only Rules have publicly admitted that medical professionals who are "trained to do a [dilation and curettage procedure] following a miscarriage of a pregnancy [are] trained to do an abortion."[11]

[11] Fischer, *supra* note 10 (quoting Cathi Herrod, president of the anti-choice organization Center for Arizona Policy).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1
2
3
4

100.    Similarly, APCs in Arizona and other states can and do safely and effectively prescribe misoprostol and/or mifepristone to facilitate the evacuation of the uterus when a woman is experiencing a miscarriage.  However, despite their medical similarities, Arizona law treats these procedures differently as well.

5
6
7

101.    Arizona RNPs perform these tasks without any physician supervision, as State law permits them to run their own practices and make their own informed medical judgments regarding when to refer patients to physicians in complicated cases.

8
9
10
11
12
13
14
15

102.    Peer-reviewed studies have found that APCs are capable of providing both aspiration and medication abortion safely and effectively during the first trimester of pregnancy.  Accordingly, the National Academy of Sciences concluded in its recent consensus report that "[b]oth trained physicians . . . and APCs (physician assistants, certified nurse-midwives, and nurse practitioners) can provide medication and aspiration abortions safely and effectively," citing an "extensive body of research documenting the safety of abortion care in the United States."  National Academies Consensus Report at S-9.

16
17
18
19

103.    Medical authorities, including ACOG, the American Public Health Association (APHA), and the World Health Organization, have also concluded that laws prohibiting APCs from providing these services are without medical foundation, and that these restrictions represent a barrier to accessing safe abortion care.

20
21
22
23

104.    The FDA has also recognized that there is no medical need for physician-only restrictions on medication abortion.  In 2016, the FDA amended the label for Mifeprex to clarify that, based on published research, non-physician health care providers could safely administer the drug.[12]

24
25
26

27
28

---

[12] FDA Ctr. for Drug Evaluation & Res., Summary Review of Application No. 020687Orig1s020, 17 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/ 020687Orig1s020SumR.pdf.

105. APCs are legally permitted to perform both aspiration and medication abortion care in several states across the country, and permitted to provide medication abortion alone in numerous additional states.

106. The Arizona experience reflects these authorities. Prior to 2011, APCs providing medication abortions were the majority of existing individual abortion providers in Arizona. In fact, APCs provided almost all of the medication abortions performed at PPAZ between 2001, when PPAZ first began providing medication abortion, and 2011. They provided a quality of care comparable to physician providers.

107. The Arizona State Board of Nursing has specifically and unanimously recognized that RNPs with proper training and education can provide safe and effective first-trimester aspiration abortions.

108. Moreover, between October 2001 and June 2010, an APC regularly performed aspiration abortions in Tucson. Her safety record was exemplary. Her complication rates were extremely low and comparable to those of the physicians performing aspiration abortions at PPAZ. In addition, physician providers judged her equally competent to recognize and handle the few complications that arose during the procedures she performed.

109. Current PPAZ RNPs are also highly trained and qualified clinicians who could provide safe medication and early aspiration abortion care. Like other APCs in Arizona, they already provide a broad range of women's reproductive health services, and have extremely broad prescriptive authority and experience, including experience prescribing and administering misoprostol. PPAZ also employs clinicians with specific experience in abortion care or comparable services, who regularly perform procedures that are comparable in risk and complexity to medication and first-trimester aspiration abortion.

110. APCs employed by PPAZ also safely and effectively conduct all follow-up visits for abortion patients, which is where complications would typically be identified

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    and managed.  Competently performing follow-up visits requires these clinicians to be

2    trained in all aspects of the abortion procedure.

3        111.    APCs who are qualified to provide these services, including Ms. Wright, are

4    qualified to perform the tasks reserved for physicians under the Physician-Only Rules

5    with regard to first-trimester abortions.

6        112.    The State has no medical justification for the Physician-Only Rules as

7    applied to first-trimester abortion care performed by APCs.

8        C.    **The Physician-Only Rules Unduly Burden Arizona Women's**
9              **Constitutional Right to Abortion**

10        113.    The Physician-Only Rules have reduced the number of abortion providers,

11   location of abortion providers, and available appointments for abortions, thus reducing

12   access to abortion overall.  This unnecessary restriction on abortion providers has imposed

13   numerous, severe, and cumulative burdens on Arizona women.

14        114.    PPAZ has only two physicians currently on staff and two physicians serving

15   in part-time contract roles.  PPAZ also employs a number of APCs, including RNPs, RNs,

16   and CNMs.  Non-physician clinicians provide all or nearly all non-abortion care,

17   including pregnancy care and care related to miscarriage, offered through PPAZ.

18        115.    Following the passage of the Physician-Only Rules, PPAZ was forced to

19   immediately stop providing abortion services, and eventually close clinics altogether, in

20   Yuma, Prescott Valley, Chandler, and Goodyear.  PPAZ also had to stop providing

21   abortion services at other clinics not staffed by physicians.  Arizona also lost numerous

22   individual abortion providers as a result of the Physician-Only Rules.  Of PPAZ's

23   remaining clinics, only four are currently able to provide abortion care due to physician

24   availability.  One of those clinics, in Flagstaff, is currently able to provide medication

25   abortion services only one day per week.  The other three are able to offer abortion

26   services a maximum of only four days per week.

27        116.    Although Dr. Isaacson's clinic has been able to stay open notwithstanding

28   the Physician-Only Rules, those rules impose numerous burdens on Dr. Isaacson and his

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1   patients.  FPA has only two physicians on staff, one of whom is Dr. Isaacson himself.
2   Because the Physician-Only Rules effectively prohibit Dr. Isaacson from delegating any
3   abortion-related care to APCs, including the State-mandated in-person counseling visits,
4   the Physician-Only Rules create a substantial strain on physician time.  Any given day,
5   one physician at FPA only sees patients for the counseling visits while the other only sees
6   patients for abortion procedures.  Without the Physician-Only Rules, both physicians
7   could spend their days providing abortion care to patients, increasing access and relieving
8   congestion.  FPA could also hire APCs to provide abortion services.

9      117.    But for the Physician-Only Rules, Dr. Isaacson and FPA could perform
10   significantly more procedures, with decreased delays.  Although Dr. Isaacson and FPA
11   schedule patients for procedures as soon as possible under the circumstances, as a result of
12   the Physician-Only Rules, the clinic cannot meet the level of demand, and patients must
13   schedule appointments further out, thereby delaying patients' access to health care.  Such
14   medically unnecessary delays harm patients' health.

15      118.    PPAZ's Yuma and Prescott Valley clinics served rural populations in the
16   northern and western parts of the state that are particularly burdened by the Physician-
17   Only Rules.  Yuma is approximately 186 miles—at least a six-hour round trip—from the
18   closest PPAZ clinic providing abortion services, in Tempe.  For women who lack access
19   to a vehicle, public transportation would take significantly longer and may often be
20   impossible.  The only alternative is for women to travel to another state to receive care.
21   Reflecting these challenges, in 2016, the abortion rate in Yuma County was only 1.1
22   abortions obtained per 1,000 women of childbearing age, far below Arizona's average rate
23   of 10 per 1,000 women.  Similarly, Prescott Valley, where PPAZ provided abortion
24   services before the Physician-Only Rules went into effect, is approximately 82 miles away
25   from PPAZ's Glendale clinic and 85 miles away from PPAZ's Flagstaff clinic.

26      119.    PPAZ's Flagstaff clinic serves a particularly vulnerable population with a
27   long history of discrimination regarding access to medical services.  The Hopi, Navajo,
28   and Hualapai Indian Reservations make up approximately half of the northern part of the

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

state, including the state's two poorest counties, Apache and Navajo. Moreover, this area is rural, meaning that women need to travel significant distances to obtain abortion care. For instance, women traveling from Hopi or Navajo land could be required to travel more than 200 miles each way just to reach Flagstaff, and even further—up to 10 hours round trip—if they need a surgical abortion, which is not available in Flagstaff. Similarly, the Hualapai reservation is approximately 113 miles from PPAZ's Flagstaff clinic. The abortion rates in Apache and Navajo County—1.4 and 3.6, respectively—are among the lowest in Arizona.

120. The Flagstaff clinic also serves many college students, who have difficulty saving adequate funds to obtain an abortion and often wish to keep the procedure confidential.

121. Women living in other towns in the northern and western parts of the state also face significant travel-related burdens. For example, a woman living in Colorado City would be required to travel approximately 229 miles each way to reach PPAZ's Flagstaff clinic, a nearly eight-hour round trip.

122. As explained, travel in the northern part of Arizona is particularly difficult due to conditions including rural roads and poor weather conditions. Therefore, while such travel is always a long, logistically difficult, and expensive proposition, at certain times of year and for women living in certain locations, these trips may be physically impossible.

123. Women living in southern and eastern Arizona must also travel significant distances to reach PPAZ's Tucson clinic. For instance, a woman living in Douglas must travel nearly five hours round trip per visit to reach the Southern Arizona Regional Health Center in Tucson, while a woman living in Nogales must travel approximately three hours round trip. Women from eastern parts of Arizona have to make similar treks, as the towns of Clifton and Morenci, for example, are approximately five hours from Tucson, round trip.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

124.    A woman facing these long travel distances and difficult conditions must delay her abortion until she can arrange and pay for transportation, must often take time off work or miss school, and must arrange and pay for childcare.  Low-wage workers often have no access to paid time off or sick days.  These costs can be prohibitive for poor and low-income women.  Accordingly, the Physician-Only Rules often result in significant delays and completely deny some women access to care.

125.    Women in Apache, Cochise, Gila, Graham, Greenlee, La Paz, Mohave, Navajo, Pinal, Santa Cruz, Yavapai, and Yuma Counties currently live in counties without a health clinic providing abortions.  These include the eight poorest counties in the state, and the counties with the eight lowest abortion rates.  Women living in these counties face a particularized burden because the Physician-Only Rules deny them access to qualified health care providers who could provide abortion care more regularly, significantly closer to where they live, and at a reduced cost.

126.    The most populous county in Arizona is Maricopa County, with a population of nearly 4 million people.  Alongside other independent providers, PPAZ has only two physicians, splitting their time between two clinics, available to serve this entire population, along with women traveling from other areas of the state.

127.    Dr. Isaacson's clinic, also located in Maricopa County, is one of only three private medical practices in Arizona—all located in the Phoenix area—that regularly provide abortions beyond 16 weeks LMP.  As one of the only providers of abortions beyond 16 weeks LMP, and one of the main referrals for pregnant women with medical indications, including fetal anomalies, Dr. Isaacson sees first-hand the strain the Physician-Only Rules impose on his ability to serve these patients, as FPA only has two physicians on staff and cannot practicably delegate any medication or aspiration abortion care to other qualified clinicians.

128.    The second-most-populous county in Arizona is Pima County, with a population of nearly 1 million people.  PPAZ has only one physician available to serve this entire population, as well as the entire southern and eastern parts of the state.

129.    The Physician-Only Rules deny women in Maricopa and Pima Counties, and women traveling to those counties to receive abortion care, access to qualified health care providers who could reduce wait times and provide continuity of care, as oftentimes APCs are women's primary reproductive health care providers.

130.    PPAZ's only other clinic providing abortion care, in Flagstaff, provides medication abortion only, and only one day per week.  Prior to the 2011 expansion of the Physician-Only Rules, the clinic provided medication abortion at least four days per week. The Physician-Only Rules therefore deny women living in Flagstaff and the surrounding area, including the entire northern part of the state, access to additional providers who could provide care additional days per week, reducing both medical risks for patients and logistical and cost-related burdens.

131.    If not for the Physician-Only Rules, PPAZ would attempt to open additional clinics to replace closed clinics and would provide medication abortion care at the Flagstaff clinic more than one day per week.  PPAZ would also use APCs to provide medication and aspiration abortion care at its remaining clinics, and would explore expanding both medication and aspiration abortion care to other clinics and additional locations.  This additional capacity would significantly decrease wait times and increase access to care for all Arizona women.

132.    If not for the Physician-Only Rules, Dr. Isaacson would hire APCs to provide medication and aspiration abortion care at the FPA clinic and to assist in other aspects of abortion care.  The additional capacity would decrease wait times and increase access to care.

133.    PPAZ and other independent providers cannot simply hire more physicians to fill the gap in abortion providers caused by the Physician-Only Rules, for multiple reasons.

134.    First, it is generally very difficult to recruit physicians to work in rural locations.  This challenge is not unique to abortion services.  New doctors, for a variety of reasons including but not limited to skyrocketing levels of student-loan debt, increasingly

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    decline to practice in rural areas.  Throughout the state, APCs and other non-physician

2    clinicians, working in-person and through telemedicine, increasingly fill gaps in rural

3    health care produced by these physician shortages.  Of course, APCs' scope of practice is

4    determined and monitored by the relevant expert bodies, such as the Arizona State Board

5    of Nursing.  Without medical justification and over the judgment of Arizona's expert

6    regulatory bodies, the Arizona Legislature has barred Arizona abortion providers from

7    using the tools available to other health care providers to address this challenge while

8    providing high-quality health care.  As a result, Arizona women are currently denied the

9    medical, logistical, and emotional benefits of improved access to abortion-related health

10   care.

11        135.   Second, through what is known colloquially as the "stadium rule,"[13] Arizona

12   affirmatively prohibits State-funded medical schools from providing training in abortion

13   care.  Therefore, only those Arizona medical residents who receive training from PPAZ

14   physicians or Dr. Isaacson and the other physician at FPA generally obtain experience in

15   abortion care.  This includes medical residents seeking a specialization in obstetrics and

16   gynecology.  As a result, Arizona physicians who have opted out of such training in

17   residency may not consider abortion care as part of their regular practice of medicine.

18        136.   Third, physicians providing abortion services in Arizona are targets of

19   harassment by anti-choice activists.  Arizona physicians providing abortions have

20   experienced numerous incidents of harassment, including daily protesting outside of their

21   workplaces; protesting outside of their homes; threats; and online harassment.  This

22   harassment and related stigma is a significant obstacle to recruitment of physicians to

23   provide abortions in Arizona.

24        137.   Fourth, on information and belief, even medical residents who do in fact

25   learn to provide safe abortion care choose not to include abortions in their practices at

26

27   [13] This was dubbed the "stadium rule" because it was enacted as a rider on a bill
     authorizing the expenditure of funds to build a new football stadium at the University of
     Arizona.  *See Roe v. Ariz. Bd. of Regents*, 113 Ariz. 178, 180 n.2 (1976) (Gordon, J.

28   dissenting).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    least in part due to fear of inadvertently violating one of the State's many complicated,

2    medically unnecessary, and often unintuitive TRAP rules.

3        138.    Fifth, the cost of employing physicians is significantly higher than the cost

4    of employing APCs.  For instance, PPAZ must pay physicians approximately twice what

5    it would cost to hire APCs.  This directly increases costs to PPAZ and other independent

6    providers operating within Arizona, and makes it financially difficult to maintain clinics

7    in rural areas in particular.

8        139.    PPAZ has attempted to identify and recruit additional physicians, but has

9    not succeeded in doing so.

10        140.    These burdens reduce women's access to abortion services on their own and

11   also in tandem with the burdens imposed by the Telemedicine Ban and the Mandatory

12   Delay and Two-Trip Requirement.

13   **V.    Arizona's Mandatory Delay and Two-Trip Requirement**

14        141.    In 2009, the Arizona Legislature enacted A.R.S. § 36-2153, which mandates

15   a woman complete an in-person consultation with a licensed physician at least 24 hours

16   before receiving an abortion.  The Legislature subsequently required that the woman also

17   receive an ultrasound at least 24 hours prior to receiving an abortion.  H.B. 2036, 2012

18   Ariz. Sess. Laws, ch. 250 (codified at A.R.S. § 36-2156(A)(1)).  In effect, a woman must

19   make two trips to a health care clinic—on a day that a physician is present and available

20   for consultation—to receive an abortion, regardless of that woman's distance from the

21   clinic, her reasons for seeking an abortion, how certain she is, or how advanced her

22   pregnancy is.  These two in-person visits are in addition to any necessary follow-up care.

23   Arizona imposes this requirement on no other medical procedure.  It does not provide any

24   benefit and imposes significant burdens on Arizona women seeking abortions.

25        142.    As described, a physician who knowingly violates section 36-2153 is

26   subject to license suspension or revocation, and may be subject to other civil penalties as

27   well.  *See* A.R.S. § 36-2153(L).

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A.     **The Mandatory Delay and Two-Trip Requirement Provides No Benefit**

143.    The Arizona Legislature does not impose a mandatory delay or require an additional in-person physician visit for any other medical procedure administered in the state, including other procedures that affect reproductive health (such as vasectomies) or procedures with significantly higher complication rates.  Rather, the State specifically targets abortions with this burden.

144.    Clinicians owe their patients a general ethical duty of obtaining informed consent for medical procedures.  According to the American Medical Association's Code of Medical Ethics, a clinician should, for all procedures, "[a]ssess the patient's ability to understand relevant medical information and the implications of treatment alternatives and to make an independent, voluntary decision."[14]

145.    PPAZ and FPA have well-developed clinical protocols that require all clinicians to obtain informed consent from their patients.  Even in the absence of the Mandatory Delay and Two-Trip Requirement, this process would include counseling regarding alternatives to abortion and information about the nature of an abortion procedure.

146.    Arizona law also generally requires clinicians to obtain informed consent from their patients, based on their medical judgment.  PPAZ and FPA clinicians are just as capable of utilizing medical judgment with regard to informed consent as other clinicians. Furthermore, health-care professionals are capable of evaluating when and if a patient understands the consequences of obtaining an abortion and does or does not need further time for reflection.

147.    Women are capable of understanding the consequences of obtaining an abortion and making the decision to do so without any additional waiting period. Arizona's Mandatory Delay and Two-Trip Requirement demeans women's decision-making capability and embraces unwarranted stereotypes by assuming that the Arizona

---

[14] American Medical Association, Code of Medical Ethics Opinion 2.1.1, *available at* https://www.ama-assn.org/delivering-care/informed-consent.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Legislature has "a duty to protect either our wives or our daughters from making decisions that may come back to haunt them further down the road in their lives," as one legislator put it.[15]

148.    There is no medical justification for requiring women to have an ultrasound 24 hours prior to receiving an abortion, rather than immediately prior to the procedure.

149.    Arizona has not provided, and cannot provide, any evidence that the Mandatory Delay and Two-Trip Requirement is fulfilling any legitimate State purpose.

150.    Even if the mandated counseling did fulfill some State purpose, there is no additional benefit to requiring such counseling to be given in person or by a physician, rather than via phone, in writing, or via internet communication by another qualified person, and certainly no benefit that could offset the burdens associated with requiring women to make in-person trips.

**B.      The Mandatory Delay and Two-Trip Requirement Burdens Women With Unnecessary Medical Risks, Financial and Psychological Harm, and Increased Risks Associated With Intimate-Partner Violence**

151.    The Mandatory Delay and Two-Trip Requirement by definition causes, and is intended to cause, delays in Arizona women's access to abortion care, thereby forcing women to seek abortion at a more advanced state of pregnancy, when risks of complications increase.  These delays are exacerbated by the limited number of physicians providing regular abortion care, and by the fact that the few clinics that are equipped and licensed to provide abortion care are not readily accessible to a majority of geographic areas.

152.    Imposing a mandatory 24-hour delay in and of itself is medically counterproductive.  But the Mandatory Delay and Two-Trip Requirement rarely results in merely a 24-hour delay.  These delays are typically significantly longer.  For most women, it is difficult, if not impossible, to schedule an appointment with a physician on

---

[15]Steven Yarbrough, *Legislature Had Good session for Pro-Family Legislation*, Gilbert Republic, July 31, 2009, at § 12, 21; *see also* Casey Newton, *Senate OKs Abortion Restrictions*, The Arizona Republic, June 24, 2009.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

two consecutive days.  In fact, the average wait time for an appointment across PPAZ clinics is one week, and can be longer.  Wait times are similar for patients seeking care at Dr. Isaacson's clinic.

153.    Not only is abortion care limited to certain days and locations within Arizona, but women must also juggle their work or school schedules, childcare needs, and transportation availability.  Thus, these State-mandated delays are often even longer than one week.  For example, PPAZ's Flagstaff clinic, which serves the northern region of the state, does not provide aspiration abortion and only provides medication abortion services on Mondays.  Therefore, the Mandatory Delay and Two-Trip Requirement effectively imposes at least a one-week delay on women seeking medication abortions from the Flagstaff clinic.  While PPAZ's Tempe, Glendale, and Tucson clinics provide both medication and aspiration abortion, each clinic can only offer aspiration abortion services two days per week due to provider shortages.

154.    One effect of this delay is to usurp a woman's ability to choose her preferred type of abortion procedure.  Medication abortion is generally only available through 10 weeks LMP.  Because many women do not know they are pregnant for at least several weeks, women have a limited window within which they must make two appointments and arrange for time off work or school and child care if they wish to obtain a medication abortion.

155.    The Mandatory Delay and Two-Trip Requirement prevents many women from obtaining an abortion within the first 10 weeks LMP, thus forcing them to undergo an unwanted surgical procedure, often at a location far from home.  Because there are even fewer Arizona physicians providing aspiration as opposed to medication abortions, it becomes even harder for these women to locate and obtain an abortion provider. Moreover, some women have a very strong preference for medication abortion.

156.    Women living in northern Arizona who are more than 10 weeks LMP are unable to obtain abortion care in Flagstaff, where only medication abortion is available. Instead, these women must travel hundreds of miles to a provider in Phoenix or Tucson.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

And under the Mandatory Delay and Two-Trip Requirement, they must do this twice, or arrange to stay overnight if they can obtain a second appointment the next day and make the necessary work and childcare arrangements to stay overnight.

157.    Delaying access to abortion also increases the risk of complications and may necessitate more invasive procedures.  Although abortion is an extremely safe procedure, and significantly safer than giving birth, the risk of complications increases as the pregnancy continues.

158.    Mandatory delay laws force women to have second-trimester abortions who otherwise would have had first-trimester abortions.  Moreover, women seeking second-trimester abortions generally travel longer distances to receive care, have more difficulty finding a provider, and suffer increased risk of complications.

159.    The Mandatory Delay and Two-Trip Requirement also damages the patient-clinician relationship.  Most PPAZ patients want to have an abortion on their first visit, without being burdened with additional trips or waiting periods.  The Mandatory Delay and Two-Trip Requirement places clinicians in the position where they must refuse medically indicated and desired care, against the medically accepted standard of care and against their ethical obligations to patients.

160.    Moreover, many women do not know that their insurance limits coverage for abortion care.  Thus, even when women have health insurance, they are often forced to pay for abortion services out-of-pocket, which exacerbates the financial hardships already associated with traveling long distances (on two separate occasions) for their procedure.

161.    The Mandatory Delay and Two-Trip Requirement multiplies the time, travel, cost, and scheduling burdens associated with securing and attending an appointment with a physician.  When a woman makes an extra trip to a health clinic, she incurs expenses in the form of lost wages, missed educational opportunities, higher travel and childcare costs, and additional time away from work, school, or other responsibilities.  Women traveling long distances to receive abortion-related health care also may need to

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

pay for an overnight stay away from home.  The time it takes for a woman to accommodate these increased costs only further delays her access to health care.

162.    These burdens are even higher for low-income women who already struggle to afford the cost of such care, and for women who live in remote areas of the state.  Many of the women who seek abortion services at PPAZ and at Dr. Isaacson's clinic are poor and live at or below 150% of the FPL.  Low-income women face the most difficulty in paying for travel costs associated with two visits to a health-care clinic, rearranging inflexible work schedules at low-wage jobs, securing and paying for childcare, and saving up the money required to cover the cost of an abortion.

163.    Because poor and low-income women often struggle to raise the necessary funds to obtain an abortion, they are more likely to be pushed out of the medication abortion window and into second-trimester abortions by additional delays.  Women served by PPAZ's Flagstaff clinic, which provides only medication abortion, are then required to travel to the Phoenix area to obtain an abortion.  The nearest clinics, including PPAZ's Tempe clinic, are approximately 150 miles from the Flagstaff clinic, adding another five hours round trip to each required visit.

164.    For women pushed out of a first-trimester abortion altogether, a second-trimester abortion is significantly more expensive than a first-trimester abortion.  At PPAZ and Dr. Isaacson's clinic, the cost of a second-trimester abortion can more than double the cost of a first-trimester abortion.

165.    The Mandatory Delay and Two-Trip Requirement also hinders a woman's ability to keep her abortion confidential, which is particularly important when a woman suffers from intimate-partner or family violence, reproductive coercion, or has become pregnant as a result of rape or incest.  Confidentiality is also particularly important to minors who fear abuse or other repercussions if their pregnancy is disclosed.

166.    When a woman has made the decision to have an abortion, delaying her ability to do so can cause a substantial toll on her emotional and psychological health.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    167.   These burdens reduce women's access to abortion services on their own and

2    also in tandem with the burdens imposed by the Physician-Only Rules and the

3    Telemedicine Ban.

4    **VI.   Arizona's Telemedicine Ban**

5    168.   On top of the Physician-Only Rules and Mandatory Delay and Two-Trip

6    Requirement, Arizona has banned the use of telemedicine—that is, technology that allows

7    health-care providers to provide care remotely using techniques such as video

8    conferencing—to provide abortion care, thereby restricting PPAZ's ability to improve

9    access to abortion care, particularly in rural and underserved areas.  A.R.S. § 36-3604(A).

10   Despite telemedicine's wide-ranging application and proven ability to improve access to

11   affordable and effective health care, the Arizona Legislature has singled out abortion as

12   the *only* service explicitly precluded from the practice of telemedicine.  This restriction

13   has no medical justification, and imposes significant burdens on Arizona women.

14   **A.   Arizona Promotes Telemedicine Outside the Abortion Context**

15   169.   More than two decades ago, the Arizona Legislature established one of the

16   nation's first network of facilities with telemedicine capabilities—the Arizona

17   Telemedicine Program (ATP).  Today, ATP is an award-winning leader in the field and

18   allows physicians to diagnose, consult, and treat patients from remote locations.  As of

19   2014, ATP was providing care in over 60 specialties and had facilitated over 1.3 million

20   services through its network.  As of 2015, ATP had expanded to 160 sites throughout the

21   state.

22   170.   Although Arizona is the sixth-largest state in the country by land area, it

23   consists of only 15 counties, 13 of which are considered rural.  The Arizona Legislature

24   founded ATP, in part, to provide accessible, top-quality health care to Arizonans in

25   geographically isolated or underserved communities, including Native American

26   populations.  Rural access and cost savings have been focuses of the program from its

27   inception.

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    171.    Telemedicine is a safe and cost-effective way to deliver medical care, and is

2    often as effective as in-person health-care administration, while saving clinicians and

3    patients unnecessary, time-consuming, and expensive travel.  Moreover, telemedicine

4    patients have comparable clinical outcomes to those who receive face-to-face care, with

5    equivalent success rates and a low prevalence of adverse events.  Telemedicine, and ATP

6    in particular, are generally praised for improving access to expert health care (especially

7    in rural or other sparsely populated areas), facilitating consistent management of chronic

8    diseases, and reducing costs due to improved efficiency, shared staffing, and diminished

9    travel and time away from work or school.

10    172.    In light of the success and popularity of ATP, the Arizona Legislature

11    enacted a telemedicine parity law, which requires private health plans to cover certain

12    health-care services—including trauma, burns, cardiology, pulmonology, infectious

13    diseases, and neurologic diseases (including strokes)—when delivered via telemedicine to

14    the same extent the service is covered when provided in person.  *See* A.R.S. § 20-

15    1057.13(A).  Many of these services involve more invasive medical procedures with

16    higher risk of complications than abortion care.

17    **B.    The Telemedicine Ban Has No Medical Benefit**

18    173.    In imposing the Telemedicine Ban, the Arizona Legislature included no

19    findings or purpose statement regarding medical need.  There is nothing in the legislative

20    record suggesting that the Telemedicine Ban protects or advances the health of women

21    seeking lawful abortion services.

22    174.    If the State permitted telemedicine medication abortion, PPAZ would, using

23    telemedicine, follow the same procedures as if the patient were physically present in a

24    PPAZ clinic.  These procedures include having a qualified health care provider (1)

25    confirm the patient's pregnancy; (2) perform all necessary tests to ensure that a

26    medication abortion is an appropriate course of treatment (such as ensuring that the

27

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

patient is not suffering from an ectopic pregnancy); (3) provide the patient with necessary information regarding the abortion;[16] and (4) dispense the necessary medication.

175.    Typically with in-person medication abortion, the patient takes the mifepristone at the clinic, then goes home (or to a location of her choosing) and takes the misoprostol later.  Critically, she generally does not feel any effects from these medications until she has left the clinic and taken the misoprostol.  The patient is provided with a toll-free number to ask questions or report any complications.  Staff then schedules a follow-up visit within two weeks.

176.    In a telemedicine setting, the responsible clinician (whether physician or APC) would communicate with the patient via a two-way, secured teleconference; would make sure the patient receives the necessary medication; and would observe the patient taking the mifepristone.  A qualified staff member would remain in the same room as the patient.  As with an in-person medication abortion, the patient would then take the misoprostol at a location of her choosing.  PPAZ would also provide the patient with a toll-free number and follow-up appointment.

177.    According to ACOG's standard of care for medication abortion, a responsible clinician needs only the patient's medical history, blood work, vital signs, and ultrasound images to determine whether to proceed with a medication abortion.  All of this information is usually gathered by a non-physician clinician or other qualified staff member and can be accessed by reviewing a patient's records remotely.

178.    Guidelines and practices for performing medication abortion in this manner via telemedicine have been successfully developed and deployed in the United States since at least 2008.

179.    Moreover, in addition to research showing that medication abortion can be safely and effectively provided by APCs, ACOG recommends that "[m]edical abortion

---

[16] Due to the "in person" requirement of the Mandatory Delay and Two-Trip Requirement, Arizona also bars the patient's first visit from being performed via telemedicine.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    can be provided safely and effectively via telemedicine with a high level of patient

2    satisfaction; moreover, the model appears to improve access to early abortion in areas that

3    lack a physician health care provider."[17]

4    180.    Telemedicine is also consistent with the protocol outlined on the FDA-

5    approved label for Mifeprex, including for follow-up visits.

6    181.    Dr. Richardson, PPAZ's medical director, has direct experience developing

7    plans for providing medication abortion using telemedicine, so he would be well-equipped

8    to launch a telemedicine program.  Moreover, PPAZ can access information developed by

9    others who have successfully provided abortions using telemedicine.  But for the

10   Telemedicine Ban, Physician-Only Rules, and Mandatory Delay and Two-Trip

11   Requirement, PPAZ would actively be pursuing a telemedicine program, which would

12   significantly expand access to abortion care in Arizona.

13   **C.    The Telemedicine Ban Imposes Numerous Burdens on Arizona Women**

14   182.    Rather than promote women's health, the Telemedicine Ban is demonstrably

15   harmful to health.  Because women cannot access care via telemedicine, they are required

16   to incur increased costs due to transportation and lodging expenses, time away from work

17   or school, and childcare costs, as described previously.  These burdens are particularly

18   acute for women who are poor and low-income, women who already have children, and

19   women who live in counties without abortion clinics and have to travel significant

20   distances.  Moreover, additional trips expose women who are victims of intimate-partner

21   violence to increased risk of harm, and otherwise impede women's ability to keep their

22   health-care decisions confidential.

23   183.    If telemedicine were permitted for abortion care, local clinicians could

24   perform diagnostic procedures such as ultrasounds, which PPAZ physicians and/or APCs

25   could then interpret and discuss with their patients using telemedicine.  Allowing PPAZ to

26   tap into ATP's expansive, statewide network of telemedicine-accessible health-care

27

28   [17] ACOG, *Medical Management of First-Trimester Abortion*, Practice Bulletin No.
     143, at 12 (2014).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    providers would enable clinicians to counsel patients who otherwise might not have the

2    means, time, or ability to travel great distances for an in-person discussion.

3        184.    If telemedicine were permitted for abortion care, women in rural and

4    underserved communities, including Native American populations, would have increased

5    access to clinicians.

6        185.    The Telemedicine Ban imposes direct, medically unnecessary limits on safe,

7    early medication abortions.  By carving out a single, medically unsupported exception to

8    telemedicine use, the Telemedicine Ban denies women who choose abortion access to a

9    service that is available and widely recognized to benefit other Arizona citizens.  As most

10   of Arizona is rural, some women in isolated communities have no choice but to travel

11   long distances to obtain abortion medication, which delays or prevents women from

12   accessing abortion, thereby exposing them to unnecessary medical risk and subjecting

13   them to substantial additional costs and other burdens.

14       186.    The Telemedicine Ban also works in conjunction with the Mandatory Delay

15   and Two-Trip Requirement and the Physician-Only Rules to delay access to abortion by

16   forcing some women to travel great distances to obtain in-person counseling and/or in-

17   person receipt of abortion medication from a physician.  This delayed access results in

18   some women obtaining abortions later in pregnancy, which in turn increases the risk of

19   complications and may necessitate more invasive procedures.  The delay imposed by the

20   Telemedicine Ban also denies many women the abortion method of their choice or forces

21   them to forgo an abortion entirely.  Women who face delays and lack of access to legal

22   abortion care are also more likely to attempt self-induction, including by unsafe means.

23   **VII.    Cumulatively, the Challenged Laws Impose an Undue Burden on Women's**
     **Right to Abortion**
24

25       187.    In addition to the undue burdens that each of the Challenged Laws impose

26   individually, the Challenged Laws work together to unduly burden women's

27   constitutional right to abortion.  Together, the Challenged Laws impose burdens

28   exponentially greater than the burdens imposed by any single provision in isolation.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

188. Cumulatively, the Challenged Laws, particularly when combined with Arizona's broader network of anti-choice laws, utilize the power of the State to restrict and at times eliminate abortion access, with no medical benefit; *increase* rather than decrease health risks; impose significant financial and logistical obligations on women, particularly the women most likely to need abortions and least likely to be able to shoulder those burdens; require women to travel significant distances over multiple days, a serious hardship for many; increase risks from intimate-partner violence and other forms of abuse; shame and stigmatize women and health-care providers; place unnecessary, expensive, and time-consuming obligations on patients and remaining providers in an effort to make care more difficult to obtain; undermine the clinician-patient relationship and harm quality of care; and stereotype women and deny women their agency. The State can offer no legally valid justification that could outweigh these harms.

## CLAIMS FOR RELIEF

## COUNT 1 – SUBSTANTIVE DUE PROCESS - PHYSICIAN-ONLY RULES

1. Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

2. The Physician-Only Rules violate Plaintiffs' patients' rights and the rights of Arizona women to liberty and privacy as guaranteed by the Fourteenth Amendment of the U.S. Constitution because they impose an undue burden on a woman's right to abortion before viability.

## COUNT 2 - SUBSTANTIVE DUE PROCESS - MANDATORY DELAY AND TWO-TRIP REQUIREMENT

3. Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

4. The Mandatory Delay and Two-Trip Requirement violates Plaintiffs' patients' rights and the rights of Arizona women to liberty and privacy as guaranteed by the Fourteenth Amendment of the U.S. Constitution because it imposes an undue burden on a woman's right to abortion before viability.

1

## COUNT 3 – SUBSTANTIVE DUE PROCESS - TELEMEDICINE BAN

2       5.      Plaintiffs reallege and incorporate by reference the allegations set forth in

3  the above paragraphs.

4       6.      The Telemedicine Ban violates Plaintiffs' patients' rights and the rights of

5  Arizona women to liberty and privacy as guaranteed by the Fourteenth Amendment of the

6  U.S. Constitution because it imposes an undue burden on a woman's right to abortion

7  before viability.

8           ## COUNT 4 - SUBSTANTIVE DUE PROCESS - CUMULATIVE BURDEN

9       7.      Plaintiffs reallege and incorporate by reference the allegations set forth in

10  the above paragraphs.

11      8.      The Challenged Laws cumulatively violate Plaintiffs' patients' rights and

12  the rights of Arizona women to liberty and privacy as guaranteed by the Fourteenth

13  Amendment of the U.S. Constitution because they impose an undue burden on a woman's

14  right to abortion before viability.

15                              **PRAYER FOR RELIEF**

16  WHEREFORE, Plaintiffs pray for relief as follows:

17      1.      Issue a declaratory judgment that the Challenged Laws individually and

18  cumulatively violate the rights of Plaintiffs' patients and Arizona women, as protected

19  under the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983;

20      2.      Issue a permanent injunction prohibiting Defendants and their successors in

21  office from enforcing the Challenged Laws;

22      3.      Award Plaintiffs their reasonable costs and attorneys' fees pursuant to 42

23  U.S.C. § 1988; and

24      4.      Grant such other or further relief as the Court deems just, proper, and

25  equitable.

26

27

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    Dated:  April 11, 2019                 O'MELVENY & MYERS LLP

2

3                                           By: */s/ Catalina Vergara*

4                                                    Dawn Sestito
                                                   Catalina Vergara
5                                                   Dimitri Portnoi
                                                   Brittany Rogers
6                                                   Heather Welles

7                                           Attorneys for Plaintiffs

8                                           PLANNED PARENTHOOD
                                            FEDERATION OF AMERICA
9

10                                          By: */s/ Alice Clapman*
                                                    Alice Clapman
11

12                                          Attorneys for Plaintiffs Planned Parenthood
                                            Arizona, Inc.; William Richardson, M.D.;
13                                          and Deanna Wright, N.P.

14                                          CENTER FOR REPRODUCTIVE
                                            RIGHTS
15
                                            By: */s/ Marc A. Hearron*
16                                                   Marc A. Hearron
                                                    Jessica Sklarsky
17

18                                          Attorneys for Plaintiff Paul A. Isaacson,
                                            M.D.
19

20                                          SQUIRE PATTON BOGGS (US) LLP

21
                                            By: */s/ Daniel B. Pasternak*
22                                                   Daniel B. Pasternak

23                                          Attorneys for Plaintiffs

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND
                                                          INJUNCTIVE RELIEF